## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | NO. 17-10288-WGY |
| AEGERION PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

YOUNG, D.J.                                    November 20, 2017

### MEMORANDUM & ORDER

Let's see if I've got this straight.[1]

Aegerion Pharmaceuticals, Inc. ("Aegerion") developed an effective medicine, called Juxtapid, to treat high cholesterol in people with a rare genetic disease. The treatment did not come cheap. "At market launch in January 2013, Juxtapid cost roughly $295,000 per patient per year. The annual cost of Juxtapid later increased to over $330,000 per patient per year." Information, ¶ 19.

---

[1] This recitation is taken from the Information (the charging document) and the plea agreement. ECF Nos. 1, 2. Of course, should the agreement not be accepted by this Court, the government will have to prove these matters on competent evidence before an American jury.

Thereafter Aegerion engaged in a series of unfair and deceptive acts, including outright fraud, which pervaded corporate management, all designed to increase the use of Juxtapid in circumstances where such treatment was not medically indicated. Aegerion wrongfully received a great deal of money from this corporate criminal conduct. Still more important, it appears that Aegerion knowingly induced the prescription of Juxtapid to many patients for which it would do no good, thus crowding out more promising therapies. Information, ¶ 37-39. Indeed, "[n]umerous HeFH, statin-intolerant, and diabetic patients, including elderly and pediatric patients suffered adverse events, including liver toxicity and gastrointestinal distress, and had to discontinue use of Juxtapid." Information, ¶ 39.

Facing two misdemeanor counts of introducing misbranded drugs into interstate commerce, Aegerion now seeks to plead guilty,[2] pursuant to Fed. R. Crim. P. 11(c)(1)(C) (the "'C' plea"). Under a "C" plea, the judge's choice at sentencing is limited to imposing the sentence agreed between the government and the offender or rejecting the plea altogether. Id. at 11(c)(3)(A). The judge, of course, is forbidden from engaging

---

[2]Charging decisions are entirely the province of the government for which it alone bears responsibility. This Court will express no opinion thereon.

in the plea bargaining itself. Id. at 11(c)(1). These two requirements conflict whenever a court is inclined to reject a "C" plea since an unexplained rejection smacks of personal fiat and any explanation sounds like court interference in the parties' good faith bargaining. There is no easy course. Seeking to avoid this difficulty, this Court in United States v. Orthofix, Inc., 956 F.Supp.2d 316 (D. Mass. 2013), thoroughly considered the issues and explained its conclusion that the "C" plea has no place, save in the rarest circumstances, in the context of corporate criminal pleas. Id. at 331-37.

As this case illustrates, the issues presented by the "C" plea in the corporate context are more disquieting than I had originally thought.

To begin:

Here, there is much to commend the proffered plea; unfortunately much of it remains sealed so as not to compromise on-going criminal investigations. It suffices here to say that Aegerion's top management has undergone a near complete makeover and that its cooperation with the government's law enforcement efforts is truly extraordinary.

That said, in light of the larger issues discussed below, it is the duty of this Court candidly to explain the issues it has with this proffered "C" plea. This Court is not bargaining with the parties. None of these points – singly or together –

is necessarily a deal breaker.  Each one is a consideration –

and perhaps I may well not yet have considered every relevant

issue.

Oh, Aegerion amended "C" plea –

How do I dislike thee?

Let me count the ways:

- The government agrees that sentencing may take place immediately upon this Court's acceptance of the "C" plea even without the preparation of a Pre-Sentence Report.  Why?  One can readily understand why Aegerion wants its plea and sentence to be a one-day story, soon forgotten.  Why does the government agree?  Isn't it better to permit the Court to obtain a thorough Pre-Sentence Report from its own Probation Office the better to understand this complex case?

- Are the Sentencing Guidelines properly calculated?  Why is there no enhancement for vulnerable victims?  U.S.S.G. § 3A1.1(b)(1).  One would think that the marketing of misbranded drugs to a patient population in need of appropriate treatment would meet the quintessential definition of vulnerable victims.  Is there no enhancement for the use of sophisticated means to commit the crimes?  After all, the scheme here involved falsely marketing Juxtapid for off-label uses to sophisticated physicians.  One can readily infer that such false marketing was itself sophisticated.[3]

---

[3]  The government charged Aegerion under 21 U.S.C. sections 331(a), 333(a)(1), and 352(f).  When calculating Aegerion's sentence, we are directed to section 2N2.1 of the sentencing guidelines.  The section in question does not contain reference to the use of sophisticated means to commit the crimes charged. Compare §2N2.1, with §2B1.1(b)(10(C)  ("[If] the offense otherwise involved sophisticated means and the defendant

[4]

- Assuming without concluding that the Sentencing Guidelines are properly calculated, the recommended fine range is not less than $18,542,192 to $30,903,653. Even so, the "C" plea calls for a fine of only $6,200,000 paid in installments and forfeiture of $1,000,000. The parties justify the downward variance by pointing to the extraordinary cooperation of Aegerion's new management and its present precarious financial condition.

    What is left unexplained is why the government does not simply let Aegerion collapse in disgrace. Surely Aegerion is not too big to fail. After all, its stock apparently is now owned by Novelion, Inc., an innocent investor but one knowledgeable of Aegerion's criminal conduct at the time of its investment. Couldn't an asset sale to Novelion fund the civil settlement, the fine, and the forfeiture? Couldn't Novelion pick up Aegerion's employees? After all, Juxtapid is an FDA approved medicine with an appropriate therapeutic value.

    Perhaps these questions do not make economic, real world sense. The point is, I do not know and the proffered "C" plea does not begin to explain the financial picture in detail. Apparently the parties think their representations suffice. They do not. I have a job to do - an independent judicial responsibility I may not delegate to others.

- Most problematic, this "C" plea provides not one cent of restitution to the actual victims. This result is justified say the parties by the multi-million dollar proposed settlement between Aegerion and the third-party payors, federal and state, who were fleeced into paying for misbranded drugs. Thus, governmental actors (who inferentially provided most of the purloined funds) get partial repayment but the actual victims, many of whom suffered medical

---

intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels").

complications and physical and emotional harm, get nothing.

How can I possibly justify such a result? The parties aver "that the complication and prolongation of the sentencing process that would result from an attempt to fashion a proper restitution order under 18 U.S.C. §3663 outweighs the need to provide restitution to any non-governmental victims in this case." Plea Agreement, 5d. Really?

Why? The parties are utterly silent on this point. Indeed, in light of this Court's management of the In Re Relafen Antitrust Litigation, 231 F.R.D. 52, 64 (D. Mass. 2005), it hardly seems an insurmountable burden to find out who got Juxtapid when such medication was not clinically indicated. After all, the parties agree Aegerion's gross gain is $15,451,827.

- This "C" plea obligates the government not to undertake any further prosecution of Aegerion. What is the government trading away here? Why? What other companies may be implicated? None of this information is provided. Are we not concerned we may be foisting misbranded drugs on innocent and unsuspecting victims in other nations without adequate notification to their regulatory authorities?

- This Court has already commended the new management of Aegerion for its truly remarkable cooperation. It appears to go far beyond the cooperation required in the plea agreement. Why, then, is the cooperation agreement portion of the proffered "C" plea so pallid? The language of the proffered "C" plea is hardly a template for other cases. It obligates the corporate defendant to do little more than could be required by a proper subpoena.

- The proffered "C" plea includes a comprehensive – and in this Court's mind adequate – internal compliance and review program to prevent any recurrence of this wrongdoing. The problem is that the proposed program is entirely **internal**.

[6]

There is no provision for the Court's personnel (or some independent employee) **independently** to examine compliance much like an on-site bank examiner. Even with strict compliance, independent evaluation provides valuable insight. See Gretchen Morgenson, The Fed Wants to Make Life Easier for Big-Bank Directors, The N.Y. Times (Aug. 11, 2017), https://nyti.ms/2vq7NOu ("[R]educing the information flow between bank boards and [bank examiners] just doesn't seem smart."); see also Katrice Bridges Copeland, The Yates Memo: Looking for "Individual Accountability" in all the Wrong Places, 102 Iowa L. Rev. 1987, 1924 (2017)("One of the principal problems with the government's approach to corporate crime is that the government expects the corporation to police itself. The notion that the corporation should perform the prosecutor's function of investigating, identifying, and providing evidence against the wrongdoer within the corporation is ludicrous. . . . If the government truly wants to achieve individual accountability, it must therefore conduct its own investigations from start to finish, rather than relying upon the corporation's internal investigation.").

- While the amended "C" plea now includes a period of probation, it still prohibits this Court from setting any special conditions beyond those set forth in the agreement.

- Perhaps Aegerion's plea is premature. Maybe the Court ought stay its hand until the other criminal investigations have run their course. In that way, the Court fairly could evaluate the actual value of Aegerion's cooperation. Cf. U.S.S.C. 5K1.1.

**The Larger Issue – A Two-Tier Criminal Justice System**

District judges throughout the United States play two vital roles in our constitutional polity. They try cases and sentence offenders. These two functions lie at the very heart and core of the judicial function. Upon their proper and dispassionate discharge rests much of the moral authority of the third branch of our government.

The "C" plea displaces the common law adversarial proceeding and thus directly affects the judicial role. As this Court remarked in a related context - -

> Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle. The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks. If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose flaws or abuses.[4]
>
> . . .
>
> The point in all this is that once skilled counsel arrive at a settlement in principle, the pressure to approve it and get the case concluded can become well nigh irresistible.
>
> . . .
>
> [Unfortunately], we have so "deconstructed the role of the trial judge" that far too many of our colleagues are today unclear on the concept. See Judith Resnik, Mediating Preferences: Litigant Preferences for Process and Judicial Preferences for Settlement, 2002 J. Disp. Resol. 155, 164 (2012). "This is a trial court. Trial Judges ought go on the bench every day and try cases." William G. Young, Speech to the American College of Trial Lawyers 54th Spring

---

⁴ See e.g., the plea agreement in United States v. Baker, (N. D. Ill. No. 09-cr-175, filed Aug. 24, 2011) recently criticized in David Enrich, A Hedge Fund Manager Committed Fraud. Would the U.S. Let Him Go?, N.Y. Times (Nov. 18, 2017), https://www.nytimes.com/2017/11/18/business/a-hedge-fund-manager-committed-fraud-would-the-us-let-him-go.html.

Meeting (Mar. 6, 2004), available at
http://www.actl.com/PDFs/JudgeYoungSpeech. Pdf (quoting the
Hon. John Meagher, Senior Active Justice of the
Massachusetts Superior Court (1978)). That simple precept
applies with full force to all of us privileged to serve as
judges on the federal district courts[.]
. . .
      Somehow, we seem to be forgetting that the very reason
for our judicial existence is to afford jury trials to our
people pursuant to the United States Constitution. U.S.
Const. art. III, sec. 2. Ironically, our very ability to
control our dockets to avoid the quotidian details of daily
jury trials and save ourselves instead for "really big"
constitutional adjudication insures instead that such cases
will come our way less and less. See Enwonwu v. Chertoff,
376 F. Supp. 2d 42 (D. Mass. 2005); John W. Keker, The
Advent of the "Vanishing Trial": Why Trials Matter, The
Champion (Sept./Oct. 2005) 32, 33 ("Judges led the charge
to fewer trials and now they regret it.")"

In re Relafen Antitrust Litigation, 231 F.R.D. at 58, 88, 90-91.

The Court is not alone in its skepticism. "While in recent

years the government and the defense bar have become accustomed

to relatively little judicial objection to their proposed

resolutions, the status quo is now in flux." Gina L. Simms et

al., The Judge Doth Reject: How to Prepare for Increased

Judicial Scrutiny of Corporate Settlement Agreements in Health

Care Cases, Ober Kaler (2013), www.ober.com/publications/2188-

the-judge-doth-reject-how-prepare-increased-judicial-scrutiny-

corporate. But see George Fisher, Plea Bargaining's Triumph 230

(Stan. Univ. Press 2003)("[P]lea narganing grew so entrenched in

the halls of power today, though its patrons may divide its

spoils in different ways, it can grow no more. For plea

bargaining has won."). See generally Gordon Bourjaily, DPA DOA:

How and Why Congress Should Bar the Use of Deferred and Non-Prosecution Agreements in Corporate Criminal Prosecutions, 52 Harv. J. on Legis. 543, 547-55 (2015) ("DPAs undermine the rule of law by facilitating a shadow system of adjudications away from any oversight. . . . DPAs also undermine the legitimacy of the criminal justice system in a second way--by creating the perception that certain business organizations are 'Too Big to Jail.'").

Courts throughout the country have rejected "C" pleas that do not promote justice. In February of 2010, Guidant LLC ("Guidant"), a medical device manufacturer, entered into a "C" plea with the Department of Justice ("DOJ"). See Jeremy Sternberg & Christopher Iaquinto, The Future of Corporate Criminal Pleas Under Rule 11(C)(1)(c), 28-WTR Crim. Just. 12, 14 (2014). The DOJ charged Guidant with two misdemeanor counts for submitting false and misleading reports to the Food and Drug Administration ("FDA"), and for refusing to report to the FDA a medical device correction in connection with its medical device products. United States v. Guidant LLC, 708 F.Supp.2d 903, 907 (D. Minn. 2010). Following a plea hearing, Judge Donovan Frank rejected the "C" plea, explaining that there were two provisions in the agreement that were "not in the best interests of justice and [did] not serve the public's interests because they [did] not adequately address Guidant's history and the criminal

conduct at issue." Id. at 915. The court explained that a lack
of provision requiring probation was not in the public's
interest and it was not in the interest of justice. Id. at 917.
The court also took issue with the lack of guidance in the
forfeiture piece of the agreement and "made suggestions about
how the government and Guidant could work together to satisfy
the courts concerns that an appropriate portion of the
forfeiture amount would go to the Medicare program." Iaquinto,
28-WTR Crim. Just. at 14; see Guidant LLC, F.Supp.2d at 920-21.

In the Northern District of California, Judge James Donato
rejected three "C" pleas from corporate defendants charged with
price fixing in the electrolytic capacitor industry. See Nell
Clement, Judge Donator Rejects Corporate Pleas in Capacitor
Cases, Farella Compliance Gap (August 25, 2017),
https://www.farellacompliancegap.com/2017/08/judge-donato-
rejects-corporate-pleas-capacitor-cases/. In a case against
Matsuo Electric Co. Ltd., Judge Donato rejected the plea
agreement because "he did not have sufficient financial
information about the company to support the low fine amount and
payment plan, calling the plea agreement a 'sweetheart deal' for
the company." Id. Two months later, Judge Donato rejected a
second plea agreement, this time for Elna Co. Ltd., because he
believed the fine imposed on the defendant was too lenient. Id.
In a third case a month later, Judge Donato rejected another "C"

plea for Holy Stone Holdings Co. Ltd. and stated that "he would only accept ['C' pleas] in exceptional circumstances." Id.

Aware of the concern for promoting justice, Aegerion advances three reasons why this Court ought nevertheless here take a pass and accept this proffered "C" plea.

First, Aegerion argues that times have changed since Orthofix, Inc. Look, it says, today we have the "Yates Memo" within the Department of Justice "emphasizing the importance of prosecuting the individuals responsible for the underlying wrongdoing when combatting corporate crime." Def.'s Memo Supp. Pl. Agr., 19. Such prosecutions depend on corporate cooperation, Aegerion claims, and therefore "C" pleas must be granted to garner such cooperation. Id. These are questionable premises. There has been no uptick in the prosecution of criminal executives since the issuance of the "Yates Memo" in 2015. Moreover, no responsible analysis suggests that, given the government's extensive powers to secure cooperation, granting "C" pleas plays any role in aiding its law enforcement goals.

Second, Aegerion posits that "[e]ntering into a Rule 11(c)(1)(C) plea is often a corporation's only option to resolve criminal charges as the uncertainty in sentencing inherent in Rule 11(c)(1)(B) pleas causes too great a risk to innocent employees, shareholders, investors, and other interested

parties." Def.'s Memo Supp. Pl. Agr., 20. Say what? Why is a
"C" plea often a corporation's **only** option to resolve criminal
charges? Does Aegerion think district judges simply are not
competent to sentence corporate criminals? Or is it that the
interests of drug dealers' innocent wives, children, neighbors,
and colleagues are somehow less important than those of a
corporation's shareholders and investment bankers? A "C" plea
is never a corporation's **only** option – it has the option of a
fair and impartial trial before an American jury, the purest and
most incorruptible justice humankind has ever conceived.

Finally, Aegerion argues forcefully that rejecting its "C"
plea would result in impermissible disparity in our sentencing
regime. It notes, with apparent accuracy, "[t]he vast majority
of corporate criminal charges involve (C) pleas. Since Orthofix
pled guilty in December 2012, at least 85 companies have had (C)
pleas accepted by federal courts." Def.'s Memo Supp. Pl. Agr.,
20-21. Aegerion supports this general statement with a footnote
carefully limited to detailing the practice concerning criminal
pharmaceutical corporations in this district. It is worth
repeating here in full:

> In recent years, a number of pharmaceutical
> companies have plead [sic] guilty to criminal conduct
> pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the
> District of Massachusetts. See, e.g., Plea Agreement
> at 2, United States v. Warner Chilcott Sales U.S.
> (LLC), No. 15-cr-10327 (D. Mass. Oct. 29, 2015) (Dkt.
> #2); Plea Agreement at 3, United States v.

GlaxoSmithKline LLC, No. 12-cr-10206 (D. Mass. July 2, 2012)(Dkt. #2);Plea Agreement at 6, United States v. Merck Sharp & Dohme Corp., No. 11-cr-10384 (D. Mass. Dec. 12, 2011) (Dkt. #12); Plea Agreement at 3, United States v. Elan Pharm., Inc., No. 10-cr-10431 (D. Mass. Feb. 28, 2011); Revised Plea Agreement at 8, United States v. SB Pharmco Puerto Rico, Inc., No. 10-cr-10355 (D. Mass. Nov. 8, 2010) (Dkt. # 10); Plea Agreement at 10, United States v. Forest Pharm., Inc., No. 10-cr-10294 (D. Mass. Sept. 15, 2010) (Dkt. #7); Plea Agreement at 5, United States v. Ortho-McNeil Pharm., LLC, No. 10-cr-10147 (D. Mass. Apr. 29, 2010) (Dkt. #3); Plea Agreement at 3, United States V. Pharmacia & Upjohn Co., No. 09-cr-10258 (D. Mass. Sept. 2, 2009) (Dkt. #2); Plea Agreement at 3, United States v. Biovail Pharm., Inc., No. 08-cr-10124 (D. Mass. Sept. 14, 2009); Plea Agreement at 1, United States v. Bryan Corp., No. 07-cr-10353,(D. Mass. Dec. 20, 2007.) (Dkt. #5); Plea Agreement at 3, United States v. Pharmacia & Upjohn Co., Inc., No. 07-cr-10099 (D. Mass. Apr. 3, 2007) (Dkt. #2); Plea Agreement at 3, United States v. Schering Sales Corp., No. 06-cr-10250-RBS (D. Mass. Sept. 20, 2006) (Dkt. #12); Plea Agreement at 5, United States V. Serono Laboratories, Inc., No. 05-cr-10282 (D. Mass. Dec. 21, 2005) (Dkt. #7); Plea Agreement at 2, United States v. Warner-Lambert Co. LLC, No. 04-cr-10150-RGS (D. Mass. May 13, 2004)(Dkt. #2); United States v. Bayer Corp., No. 03-cr-10118-RG (D. Mass. May 8, 2003) (Dkt. #7); Plea Agreement at 2, United States v. TAP Pharm. Products, Inc., No. 98-cv-10547 (D. Mass. Oct. 1, 2001) (Dkt. #44).

Reduced to its essence, Aegerion's argument goes like this:

Look at this roster of criminal pharmaceutical corporations

sentenced in Massachusetts:

### ROSTER OF CRIMINAL PHARMACEUTICAL CORPORATIONS

Warner Chilcott Sales U.S. (LLC)
GlaxoSmithKline LLC
Merck Sharp & Dohme Corp.
Elan Pharm., Inc.
SB Pharmco Puerto Rico, Inc.
Forest Pharm, Inc.

Ortho-McNeil Pharm., LLC.
Pharmacia & Upjohn Co.
Biovail Pharm. Inc.
Bryan Corp.
Schering Sales Corp.
Serono Laboratories, Inc.
Warner-Lambert Co. LLC
Bayer Corp.
TAP Pharm. Products, Inc.

Like these corporations, we [Aegerion] are a criminal pharmaceutical corporation. They **all** got "C" pleas. Therefore we should too – it's forbidden disparity if we don't.

This argument is silly – complete balderdash. The disparity addressed by the Sentencing Reform Act of 1984 and the jurisprudence that follows it deals with unwarranted disparity among sentences actually imposed, not the analyses the judges used to get there.[5]

Aegerion has, however, proved a different type of unwarranted disparity – the shocking disparity between the treatment of corporations and individuals in our criminal justice system. I am ashamed I had not recognized this glaring inequity until this case. Passing without further comment the truly breathtaking extent of pharmaceutical corporate criminality revealed by the "roster" above, Aegerion proves beyond peradventure that a forbidden two-tier system pervades our courts. Corporations routinely get "C" pleas after closed

_____

[5] Save perhaps as that analysis is reflected in an actual sentence.

door negotiations with the executive branch while individual offenders but rarely are afforded the advantages of a "C" plea. Instead, they plead guilty and face a truly independent judge. This is neither fair nor just; indeed, it mocks our protestations of "equal justice under law."

It's not hard to understand why corporations facing criminal charges seek "C" pleas. It gives them various advantages, including the most effective damage control.

Save when they are themselves on the attack, seeking to enforce their own property rights, corporations today seek to avoid the legal system altogether, see In re Relafen Antitrust Litigation, 231 F.R.D. at 89-93; Mark Galanter, The Hundred-Year Decline of Trial and the Thirty Years War, 57 Stan. L.Rev. 1255, 1272-74 (2005) ("The recent accelerated decline in the number of trials is . . . part of a much broader turn from law, a turn away from the definitive establishment of public accountability in adjudication . . . ."), negotiating their differences with the administrative state in other fora, see William G. Young, An Open Letter to U.S. District Judges, 50-JUL Fed. Law. 30, 33 (2003) ("[Corporations have] a good chance of opting out of the legal system altogether. Today's expansive reading of the Federal Arbitration Act allows the unilateral imposition of arbitration clauses to trump all sorts of civil rights and consumer protection legislation. Coupled with today's expansive

preemption jurisprudence, business can (and does) make a rational calculus that leads it to lobby for an ever-diminishing role for the federal district courts."). They have been enormously successful. The insurance industry found it could largely immunize itself from suit due to the Employee Retirement Income Security Act ("ERISA").[6] In light of Supreme Court jurisprudence, many corporations found that through mandatory anti-consumer arbitration they could largely lock the little guy out of the courthouse.[7] Moreover, corporations frequently found

---

[6] See 29 U.S.C. § 1132(a)(1)(B); Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004) ("[I]f an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)"); DiFelice v. Aetna U.S. Healthcare, 346 F.3d 442, 459-460 (3d. Cir. 2003) (Becker, J.) ("Given that ERISA's remedial scheme often provides no remedies, litigants have gone to great lengths to identify state causes of action that are not preempted by ERISA, and courts have generally been sympathetic to their efforts even when ultimately finding their claims preempted"); Andrews-Clarke v. Travelers Ins. Co., 984 F.Supp. 49, 63 n.74 (D. Mass. 1997) ("Whenever Congress extinguishes a right which heretofore has been vindicated in the courts through citizen juries, there is a cost. It is not a monetary cost. It is a cost paid in rarer coin — the treasure of democracy [itself]").

[7] Indeed a thorough government study confirms how effective is compulsory consumer arbitration in stifling consumer claims altogether. See Arbitration Study Report to Congress, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act § 1028(a), Consumer Financial Protection Bureau (March 2015), https://www.consumerfinance.gov/data-research/research-reports/arbitration-study-report-to-congress-2015/; CFPB Study Finds That Arbitration Agreements Limit Relief for Consumers, Consumer Financial Protection Bureau, (Mar. 10, 2015), https://www.consumerfinance.gov/about-us/newsroom/cfpb-study-

they could make peace with many executive agencies without admitting liability (thus exposing them to related civil litigation) and, even more important, could compel the imprimatur of the courts thereon.[8]

---

finds-that-arbitration-agreements-limit-relief-for-consumers/. Whatever the fate of fate of implementing regulations, this devastating study will not disappear. Its factual findings are admissible wherever relevant. Fed. R. Evid. 803(8)(C); Beech Aircraft Corp. v. Rainey 488 U.S. 153, 161 (1988). Even so, banks and so called service companies still deploy such compulsory anti-consumer arbitration clauses in their fine print. When they nevertheless advertise themselves as pro-consumer, their overweening sophistry may well qualify as an unfair and deceptive practice. State authorities could, of course, regulate these matters were it not for the protective cloak the Supreme Court has thrown over mandatory anti-consumer arbitration. See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 352 (2011); American Exp. Co. v. Italian Colors Restaurant, 133 S. Ct. 2304, 2309 (2013)("[T]he antitrust laws do not guarantee an affordable procedural path to the vindication of every claim."); Jessica Silver-Greenberg and Michael Corkery, In Arbitration, a "Privatization of the Justice System", N.Y. Times (Nov. 1, 2015), https://www.nytimes.com/2015/11/02/business/dealbook/in-arbitration-a-privatization-of-the-justice-system.html ("Over the last 10 years, thousands of businesses across the country — from big corporations to storefront shops — have used arbitration to create an alternate system of justice.").     ; Jessica Silver-Greenberg and Robert Gebeloff, Arbitration Everywhere, Stacking the Deck of Justice, N.Y. Times (Oct. 31, 2015), https://www.nytimes.com/2015/11/01/business/dealbook/arbitration-everywhere-stacking-the-deck-of-justice.html.

[8] See United States S.E.C. v. Citigroup Global Markets Inc., 827 F.Supp.2d 328, 330 (S.D. N.Y. 2011)(Rakoff, J.) (denying consent judgment "because the Court ha[d] not been provided with any proven or admitted facts upon which to exercise even a modest degree of independent judgment"), rev'd, 752 F.3d 285 (2d Cir. 2014).

Small wonder, then, that corporations seek the same cozy model (and act as though it is their due) even when facing serious criminal charges. Consider the advantages to the corporation of the "C" plea: All negotiations are private. No charges are brought until the plea deal is finalized so the risk of investigative journalism is minimized. All aspects of the sanction are negotiated so there will be no surprises from the judiciary. As the record here makes clear, the likelihood of the judge turning down the "C" plea is virtually non-existent. In a best case scenario, the court will perform the plea colloquy with a lower level functionary and will immediately impose the agreed upon sanction. Case over - in the vernacular of the days of the print journalism, "a one day story, second section, below the fold."

What is far more difficult to fathom is why the government negotiates a "C" plea with a corporation. In my experience, individuals are afforded "C" pleas only when the government's case is weak and it is trying to lock in the plea or when it is trying to flip an implicated co-defendant and obtain evidence against others. Neither of these concerns apply in most corporate criminal prosecutions. A corporation has no Fifth Amendment privilege, Braswell v. United States, 487 U.S. 99, 102 (1988), and it cannot testify. In my experience, the government

never even commences a criminal prosecution against a
corporation unless it has a very strong case.[9]

So why does the government uniformly buckle on this point?
Knowledgeable commentators have levelled harsh criticisms
against prosecutors for such risk aversion. See e.g. Jesse
Eisinger, The Chickenshit Club: Why the Justice Department Fails
to Prosecute Executives (Simon & Schuster 2017); Jed S. Rakoff,
Justice Deferred is Justice Denied, The N.Y. Review of Books
(Feb. 19, 2015),
http://www.nybooks.com/articles/2015/02/19/justice-deferred-
justice-denied/. Lacking sufficient knowledge, this Court
expresses no opinion.

I can, however, offer two observations prosecutors ought
always keep in mind.

First, **trials matter**. "Every lawsuit – whether it is a
dispute arising out of a contract, the purchase of a defective
product, or the conduct of a government official – has the
potential to change the rules that govern behavior going
forward." Alexandra Lahav, In Praise of Litigation 6 (Oxford
Univ. Press, 2017). The verdict of an American jury has a moral
force incomparably greater than any plea. That's why

---

[9] APTX was an exception. There the prosecution appeared to
have been brought seeking only to salvage something – anything –
from inept government contract administration. Orthofix, Inc.,
956 F.Supp.2d at 335-37.

corporations are so desperate to avoid them. Corporate pleas involve well-educated elites talking to other equally well educated elites. Things are said, sanctions imposed, nothing really happens. Prices do not come down. Consumers gain no perceptible benefit. Corporations march on, apparently impervious to government regulation or the law itself.

Contrast an actual trial: every trial is a public morality play – perhaps a story of greed and avarice or amoral chicanery, all of it played out live upon actual understandable evidence before twelve public judges largely chosen at random. The result is the fairest, most incorruptible, democratic expression of justice humankind has ever known. "[L]itigation is a social good [which] enables people to promote the rule of law and affirms our citizen-centered political system." Id. at 1.

> Litigation helps democracy function in a number of ways: it helps to *enforce* the law; it fosters *transparency* by revealing information crucial to individual and public decision-making it promotes *participation* in self-government; and it offers a form of *social equality* by giving litigants equal opportunities to speak and be heard.

Id. at 1-2.

> [A] trial can also provide the impetus for the creation and dissemination of stories that might not otherwise be heard, as well as testing narratives that cannot withstand scrutiny. By fitting facts into legal standards, by laying blame and freeing from blame, a trial produces narratives about our society. The competing narratives presented by defendants and plaintiffs sharpen understanding of existing disagreements and help participants and observes to

[21]

clarify what is at stake for society. Individuals and groups can then debate those narratives and dispute them, so that although the legal process ends with the trial and appeal, the democratic conversation can continue.

Id. at 66-67. Prosecutors ought not lightly bargain away the compelling societal advantages of a trial simply to insure a determination of corporate guilt.

Second, every corporate "C" plea diminishes the legitimacy of our independent judiciary. See generally Bourjaily, 52 Harv. J. on Legis. at 547-55. Even when prosecutors agree to bargain for a plea, why make it a "C" plea? What does a "C" plea add to the public good where prosecutors have a sound case? Face it, if used in strong cases the "C" plea delegitimizes the central role of the trial judge. [10]

Any injustice rankles Americans, systemic injustice rankles them profoundly. Those of us who occupy the constitutional

---

[10] I have served as a judicial officer for nearly 40 years now. I have never seen more widespread and varied attempts to delegitimize our judicial institutions. See e.g. "[Our criminal justice system] is a joke and it's a laughingstock," Donald J. Trump, President of the United States of America, Remarks in Cabinet Meeting (Nov. 1, 2017)(transcript available at https://www.whitehouse.gov/the-press-office/2017/11/01/remarks-president-trump-cabinet-meeting); Suzanne Spaulding, Don't Overlook the Kremlin's Threats to our Courts, Wash. Post (Oct. 30, 2017), https://www.washingtonpost.com/opinions/dont-overlook-the-kremlins-threats-to-our-courts/2017/10/30/f1e656aa-bd8e-11e7-959c-fe2b598d8c00_story.html?utm_term=.f24d7859fd95 (Russian attempts to divide our people and alienate them from their institutions include the judicial branch and American juries).

offices of the United States — in whatever branch we serve —
must humbly acknowledge that there exists in America today a
deep and pervasive sense of injustice. See e.g., Sophie
Gilbert, The Movement of #MeToo, The Atlantic (Oct. 16, 2017),
https://www.theatlantic.com/entertainment/archive/2017/10/the-
movement-of-metoo/542979/; J.D. Vance, Hillbilly Elegy (Harper
Press, 2016); Elizabeth Day, #BlackLivesMatter: The Birth of a
New Civil Rights Movement, The Guardian (July 19, 2015)
https://www.theguardian.com/world/2015/jul/19/blacklivesmatter-
birth-civil-rights-movement.

When Margo Price sings plaintively —

> at the end of the day,
> it feels like a game . . .
> one I was born to lose[11]

she's speaking to the lives of far too many Americans.

## CONCLUSION

Upon this record and against this background, accepting
this "C" plea simply is not in the public interest. There are
just too many unknowns here and the "C" plea process itself
unduly hobbles this Court's sworn constitutional duty to "do
equal right to the poor and to the rich." 28 U.S.C. § 453.

---

[11] Margo Price, Pay Gap, All American Made (Third Man Records
2017).

I end as I began. I am not bargaining with anyone. The problem is the "C" plea process itself. Indeed, as I have already said, there is much in the proffered plea agreement to commend. Moreover, there is here not a scintilla of evidence of collusion among the parties. This does not appear to be a sweetheart deal. Were this Court to have a free hand, I might well sentence Aegerion to virtually the same sentence as the parties here urge on the Court (that's what happened in Orthofix) – or I might not. I simply do not know because, as yet, the parties have deprived me of that responsibility, perpetuating an improper and unjust two-tier system that erodes public confidence in the sentence to be imposed in violation of 18 U.S.C 3553(a) (if indeed it does not violate the Equal Protection clause of the 14th Amendment to the U.S. Constitution).

This case will stand for trial as previously ordered.

WILLIAM G. YOUNG
DISTRICT JUDGE